**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-627 (BAH)** |
| **v.** | : | |
| | : | |
| **RICHARD BRYAN WATROUS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Richard Bryan Watrous to 14 days incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

The defendant, Richard Bryan Watrous, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Richard Watrous pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating or Picketing in the Capitol Building. As explained herein, a period of home detention and probation is appropriate in this case because Watrous (1) knew when he traveled to Washington, D.C. in early January 2021 that Congress was scheduled to undertake the certification vote on January 6 though he felt he wasn't going to have a significant impact on the proceedings; (2) approached the Capitol building in the afternoon of January 6 despite hearing flashbang

1

grenades and detecting tear gas in the air upon his arrival to the Capitol grounds; (3) took this photo of a damaged window by the Upper House Door but then still entered the Capitol:



(4) remained inside the Capitol for approximately 5 minutes despite immediately recognizing upon his entry that the situation was "fucked up," in his words; (5) watched as a man went inside and stole wine reportedly from Speaker of the House Nancy Pelosi's office; (6) after watching a rioter steal the wine, re-entered the Capitol a second time despite his apparent misgivings about what was taking place; (7)  minimized his conduct when interviewed by the FBI; and (8) on October 1, 2020, contacted the Proud Boys to obtain further information on the group.

The Court must also consider that Watrous's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew*

*Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As described above, Watrous's participation in a riot that actually succeeded in halting the Congressional certification combined with Watrous making multiple entries renders a sentence of incarceration and probation both necessary and appropriate in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 28 (Statement of Offense), at 1-4. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite attempts by law enforcement to fight them off. Even those who did not attack others, destroy property, or threaten members of congress themselves supported those who did by joining them. The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.





With that backdrop we turn to Watrous's conduct and behavior on January 6.

*Richard Watrous's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Richard Watrous traveled alone to Washington, D.C. from his home in Cortland, New York to attend the "Stop the Steal" rally. He advised the FBI he traveled to Washington, D.C. because he believed that then-President Trump told him to.

Once in Washington, D.C., Watrous attended a rally on the night of January 5 at Liberty Square. The next day, he attended the rally at the Ellipse. Watrous wore a red baseball cap, a blue bandana as a facemask and a blue coat with tan patches on the elbows. Watrous stayed for then-President Trump's entire speech and as soon as Trump left the stage, Watrous walked toward the Capitol.

Watrous had visited Washington, D.C. and specifically, Capitol Hill, in December 2020. At that time, he noted that he could not get close to the Capitol Building because it was surrounded by barriers and guarded by police. Upon approaching the Capitol building on January 6, Watrous observed people already on the inauguration stage on the Capitol's West Plaza. Watrous heard flashbang grenades and could detect tear gas in the air even though he was not yet close to the building. A photo Watrous took as he approached the Capitol shows the barriers to keep people away:



Undeterred by these observations, he pressed forward. Watrous rounded the Capitol to the

East side, taking another photo of yet more barriers and the police response:



Watrous photographed a police Special Weapons and Tactics (SWAT) Team arriving at the Capitol.  Still, he pressed forward to the Upper House Door where he photographed visible damage to the window.  Watrous also recorded a video of a lone police officer at the open door facing dozens of rioters screaming things like, "you swore an oath!" and "this is our house!" while an alarm blared.  Other rioters openly discussed a shooting that had taken place.[1]

As shown in the following surveillance photographs, Watrous entered the Capitol building through the Upper House Door at approximately 2:48 p.m.



---

[1] This undoubtedly refers to the shooting of Ashli Babbitt.  A rioter yells at the police officer, "It's your fucking fault she got shot you fucking coward!"





Watrous lingered in the hallways near the Upper House Door.  He later told FBI agents that he was thinking, "This is fucked up.  This is crazy.  What is going on here?" He also told the FBI agents he felt that the people around him were "trouble-makers" and "not peaceful protestors." Watrous looked down a second hallway where he saw a confrontation between rioters and police. A group of officers had attempted to move down the hallway but were attacked by a rioter while other rioters slid furniture at the officers.  Watrous filmed the end of this confrontation, capturing

an alarm blaring while rioters yelled at the officers, "you going to shoot someone else?"  After observing that scene, Watrous reportedly thought, "There's no damn way I'm going deeper in there."  Watrous left the Capitol through the same doors in which he entered at approximately 2:53 p.m.

Watrous remained on the steps outside the Upper House Door.  There, he heard a man say he was going to Speaker Pelosi's Office.  Watrous saw the man come back out of the Capitol a few minutes later, obviously having been pepper-sprayed, carrying a bottle of wine with a label with the words, "Democratic Convention."  The man said, "I got Nancy Pelosi's wine."

Watrous sat on the steps outside the Upper House Door for approximately 15 minutes before walking away.  He met a woman who stated she hosted a YouTube channel.  The woman asked Watrous if she should go in the Capitol, to which Watrous reported he told her that he'd gone inside and "there isn't much to see."  Watrous then entered the Capitol a second time with the woman, reportedly briefly staying in the Rotunda area.[2]  After parting ways with the YouTube host, Watrous left the Capitol grounds and returned home to New York the following day.

In total, Watrous spent 5 minutes inside of the Capitol on his first venture, during which time Watrous took several photographs and a video, and an unknown amount of time inside the Capitol on his second undertaking. Watrous has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and he engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

---

[2] Information regarding the defendant's second entrance into the Capitol comes from the defendant's interview with the FBI.  The government was not able to locate video of the defendant's second entrance into the Capitol.

*FBI Interview*

On June 11, 2021, the FBI interviewed Watrous.  During the voluntary interview, Watrous admitted his actions on January 6 but sought to minimize his motivation behind them. He told the police he didn't go anywhere he wasn't supposed to be on January 6 and "I was pissed they were allowing it to happen," apparently proposing that the riot on January 6 was somehow the fault of the Capitol Police.  Watrous said he eventually realized he "wasn't sure I was supposed to be there" as if the barricades, flashbangs and tear gas otherwise served as the Capitol's welcome mat.

*The Charges and Plea Agreement*

On September 21, 2021, Richard Watrous was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 28, 2021, he was arrested at his home in New York.  On October 14, 2021, the United States Attorney's Office filed an Information charging Watrous in four counts.  On January 14, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea agreement, Richard Watrous agreed to pay $500 in restitution to the Department of the Treasury as part of the $1,574,213.89 in damage caused to the Capitol by rioters.

### III.   Statutory Penalties

Watrous now faces a sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Watrous faces up to six months of imprisonment, up to five years of probation, and a fine of up to $5,000. Watrous must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v.*

*Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

Watrous agreed under the terms of the plea agreement to pay $500 in restitution. The government has previously briefed the restitution issue before this Court in relation to *United States v. Torrens*, 21-cr-204, ECF 99. The numbers for restitution have slightly changed. In response to the Court's request, the updated calculations on restitution are set forth as follows:

| | |
|---|---|
| Architect of the Capitol | $1,234,354.01 |
| House Chief Administrative Officer | $338,294.83 |
| Secretary of the Senate | $32,075.00 |
| Senate Sargent at Arms | $79,490.05 |
| Total | $1,574,213.89 |

Capitol Police:

| | |
|---|---|
| Lost and Damaged Property | $41,719.90 |
| Medical Payments | $73,719.55 |
| Continuation of Pay (COP)/Workers Compensation | $1,045,129.80 |
| Total | $1,160,569.25 |

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a period of probation and short incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As he entered the Capitol, Watrous —at a minimum— observed barricades, heard flashbangs, detected tear gas, photographed a SWAT team responding and photographed damage to the Capitol building. No rioter was a mere tourist that day.

Additionally, this Court should assess Watrous's individual conduct on a spectrum of aggravating and mitigating circumstances. This Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media;

(8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition.

While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Watrous personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Watrous's part is therefore not a mitigating factor in misdemeanor cases.

Watrous entered the Capitol through the Upper House Door after proceeding past barricades, precision grenades, and tear gas.  As Watrous approached the door, he heard an alarm blaring and observed the windows were broken.  Even after entering, observing a confrontation between rioters and police and determining he should not be inside, he left and re-entered the Capitol at a different location.  His assertion that police allowed rioters to overwhelm the Capitol is an affront to the hundreds of officers injured that day preventing exactly that.

Accordingly, the nature and the circumstances of this offense reflect a need for a period of incarceration and probation.

### B.  Watrous's History and Characteristics

As set forth in the PSR, Watrous has a long history of employment and a limited criminal history. ECF No. 31, ¶¶ 57-68, 25-28. In 2001, Watrous was arrested for misdemeanor Driving While Intoxicated.  While records do not confirm a conviction, Watrous acknowledged the arrest during his PSR interview.  ECF No. 31, ¶ 28.  He appears to have been compliant with his conditions of pre-trial release.

Overall, Watrous has taken responsibility for his actions despite originally attempting to mitigate them when interviewed by the FBI.  The government has no evidence of social media

posts by Watrous promoting his crimes, although he did privately share some photographs from January 6 with friends and family. When approached by the FBI, he voluntarily told the agents about his involvement.  Watrous accepted the government's plea offer early on in this case, demonstrating his acceptance of responsibility. In the PSR, Watrous stated, "I regret breaking the law and going into the Capitol."  ECF No. 87, ¶ 22.

Considering his lack of criminal history and his post-arrest conduct, the government requests a probationary sentence with a short period of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### 1.  General Deterrence

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### 2.   Specific Deterrence

In October 2020, Watrous emailed the Central New York Chapter of the Proud Boys[4] "Hi I'm Rick I live here in [Central New York] and I am interested in possibly joining…thanks." Watrous told the FBI he had seen the Proud Boys at rallies and heard politicians discuss them and he wanted to know more about their activities.  The Proud Boys responded to Watrous's inquiry, but he did not reply.

The government acknowledges that Watrous accepted responsibility early by entering into this plea agreement. On the other hand, his conduct on January 6, 2021 and his re-entry into the Capitol despite his prior observations demonstrates the need for specific deterrence for this defendant.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

---

[4] The Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries.  The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests and other First Amendment-protected events, where certain members sometimes engage in acts of violence against individuals whom they perceive as threats to their values.  The group has an initiation process for new members, which includes the taking of an "oath."  Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.  Multiple members of the Proud Boys have been arrested for their participation in the January 6 riot at the Capitol.  *See United States v. Nordean, et al, 21-cr-175.*

in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth). *See also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus,

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Watrous has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating or Picketing in the Capitol, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of her participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the specific blend of aggravating and mitigating circumstances present here, the Court may also consider the sentence of 36 months of probation and 14 days incarceration imposed on Glenn Croy for reference. Croy entered the Capitol twice, spending approximately 40 minutes inside, in total, where he took selfies and witnessed violence. *See* 21-cr-162-BAH, Dkt. No. 58. The case at bar is analogous to the Dalton Crase and Troy Williams cases where Crase and Williams also entered the Capitol on two separate occasions after observing tear gas deployment and broken windows. *See* 21-cr-82-01-CJN, Dkt. No. 62 and 21-cr-82-02-CJN, Dkt. No. 64. Both Crase and Williams were sentenced to 36 months'

probation with 15 days incarceration served intermittently on weekends as a condition of probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

**A. A sentence imposed for a petty offense may include both incarceration and probation.**

*1. Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[8] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by

probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.   S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.   But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).   Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).   *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).   Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4.   But that limitation "does not extend" to a defendant sentenced to a petty offense.

*See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress

enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense

case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Watrous pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty

offender may face a sentence of up to five years in probation).

>   **B. A sentence of probation may include incarceration as a condition of probation,
>   though logistical and practical reasons may militate against such a sentence
>   during an ongoing pandemic.**

>      ***1.  Relevant background***

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[9]

>      ***A.  Analysis***

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not
intended to carry forward the split sentence provided in Section 3561, by which the judge imposes
a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404,
at *98.

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in Watrous's case given the requested 14-day imprisonment sentence.

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

**VI.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Richard Bryan Watrous to 14 days incarceration, 36 months of probation and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/ Douglas G. Collyer*
DOUGLAS G. COLLYER
NDNY Bar No. 519096
Assistant United States Attorney
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, New York 12901
Office: 518-314-7800
Douglas.Collyer@usdoj.gov