UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
UNITED STATES OF AMERICA,      ) Criminal Action
                               ) No. 21-627
vs.                              )
                               )
RICHARD BRYAN WATROUS,      ) April 21, 2022
                               ) 9:33 a.m.
             Defendant.     ) Washington, D.C.
  \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

<u>**APPEARANCES**</u>**:**

FOR THE UNITED STATES:
                        DOUGLAS COLLYER
                        DOJ-USAO
                        Gateway Building
                        14 Durkee Street
                        Plattsburgh, NY 12901
                        (518) 314-7818
                        Email: douglas.collyer@usdoj.gov

FOR THE DEFENDANT:  ALLEN ORENBERG
                        12505 Park Potomac Avenue
                        Potomac, MD 20854
                        (301) 984-8005
                        Email: aorenberg@orenberglaw.com

ALSO PRESENT:        CHRISTINE SCHUCK, Pretrial Services
                        CRYSTAL LUSTIG, U.S. Probation

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                        Official Court Reporter

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  Matter before the Court,

3     Criminal Case No. 21-627, United States of America versus

4     Bryan Richard Watrous [sic].

5          Your Honor, for the record, Probation Officer

6     Crystal Lustig and Pretrial Agent Christine Schuck are

7     appearing remotely.

8          Counsel, please come forward and state your names

9     for the record, starting with the government.

10          MR. COLLYER:  Douglas Collyer for the

11     United States.

12          Good morning, Your Honor.

13          THE COURT:  Good morning, Mr. Collyer.

14          MR. ORENBERG:  Good morning, Your Honor.

15     Allen Orenberg on behalf of Mr. Watrous, who is seated at

16     counsel table.

17          THE COURT:  All right.  Are you vaccinated?

18          MR. ORENBERG:  Yes, Your Honor.

19          THE COURT:  All right.  So when you are speaking

20     you may remove your mask.

21          And is Mr. Watrous vaccinated?

22          MR. ORENBERG:  No, Your Honor.

23          THE COURT:  Then, Mr. Watrous, maintain your mask

24     on at all times.

25          All right.  You may be seated.

```
1              MR. ORENBERG:  Thank you.

2              THE COURT:  Okay.  So we're here this morning for

3    the sentencing of the defendant Richard Watrous who pleaded

4    guilty to the petty offense, in Count 4 of the information

5    against him, for parading, demonstrating, or picketing in

6    the Capitol Building, in violation of 40 U.S.C. Section

7    5104(e)(2)(G).

8              For the record, this sentencing hearing is in

9    person but the public access line is being made available

10   for persons to listen to these proceedings remotely.

11             Anyone listening to this sentencing hearing over

12   the public teleconference line is reminded that, under my

13   Standing Order 20-20, recording and rebroadcasting of court

14   proceedings including those held by videoconference is

15   strictly prohibited.  Violation of these prohibitions may

16   result in sanctions including removal of court-issued media

17   credentials, restricted or denial of entry to future

18   hearings, or any other sanctions deemed necessary by the

19   presiding judge.

20             All right.  I am going to begin this sentencing

21   hearing as I do for all my sentencing hearings, by reviewing

22   all of the materials I have reviewed in connection with

23   Mr. Watrous's sentencing to ensure that we're all working

24   from the same foundation of records.

25             So I have reviewed the probation office's
```

1    presentence investigation report docketed at ECF 32; the

2    sentencing recommendation docketed at ECF 33; the sentencing

3    memorandum submitted by the government docketed at ECF 34;

4    the sentencing memo submitted on behalf of the defendant,

5    Mr. Watrous, docketed at ECF 35.

6            I have also reviewed the eight videos and four

7    photographs identified in two reports or notices submitted

8    by the government docketed at ECFs 24 and 36.

9            And I have received no letters to the Court from

10   the defendant or others on the defendant's behalf.

11           Is that correct?

12           THE DEFENDANT:  That's correct.

13           MR. ORENBERG:  Yes, Your Honor.  Correct.

14           THE COURT:  All right.  So, Mr. Watrous, let me

15   just tell you how this sentencing hearing is going to

16   proceed.

17           Stand up when I address you, please.

18           My -- different judges do their sentencing

19   hearings in different ways.  Although there is a criminal

20   procedural rule that dictates what has to be covered during

21   a sentencing hearing, how we cover all of those provisions

22   differs from judge to judge; so I like to tell defendants

23   how my sentencing hearings are going to proceed so you know

24   what is coming up next.

25           So your sentencing hearing will proceed in three

1     different steps.  At the first step, I will determine

2     whether the government or you have any objections to any

3     factual or other portions of the presentence investigation

4     report prepared by the probation office in connection with

5     your sentencing hearing today.  If there are any objections,

6     I will resolve them.

7             At the second step, I will hear from the parties.

8     That means I will start with the government, then I will

9     turn to your counsel; and then I will turn to you to speak

10    to me about an appropriate sentence in this case considering

11    statutory sentencing factors I am required to consider under

12    18 U.S.C. Section 3553(a).

13            And then, at the last step, I will explain the

14    sentence I am about to impose and impose sentence.

15            Do you understand?

16            THE DEFENDANT:  Yes, I do.

17            THE COURT:  All right.  You may be seated.

18            Okay.  So at the first step, I have looked at the

19    presentence investigation report and sentencing

20    recommendation, both of which were filed in this matter on

21    March 24, 2022.

22            I understand, Mr. Collyer, that the government has

23    no objection to any of the factual or other determinations

24    in the PSR; is that correct?

25            MR. COLLYER:  That's correct, Your Honor.

```
 1                    THE COURT:  Okay.  Thank you.  You may be seated.

 2                    Mr. Orenberg, have you and your client read and

 3        discussed the presentence investigation report?

 4                    MR. ORENBERG:  May I --

 5                    THE COURT:  Just use the microphone right at your

 6        chair.

 7                    MR. ORENBERG:  Right here?

 8                    THE COURT:  Yes.

 9                    MR. ORENBERG:  Okay.  Thank you, Your Honor.

10                    Yes, Your Honor.

11                    THE COURT:  And I understand that the defendant

12        also has no outstanding objections to any of the factual or

13        other determinations in the PSR; is that correct?

14                    MR. ORENBERG:  That's correct.

15                    THE COURT:  All right.  Mr. Watrous, you can stand

16        right where you are.

17                    Are you fully satisfied with your attorney in this

18        case?

19                    THE DEFENDANT:  Yes.

20                    THE COURT:  Do you feel that you have had enough

21        time to talk to your lawyer about the presentence

22        investigation report, the sentencing recommendation, and the

23        government's other papers and exhibits submitted in

24        connection with your sentencing hearing this morning?

25                    THE DEFENDANT:  Yes, I have.
```

 1                THE COURT:  Okay.  You may be seated.

 2                All right.  Hearing no objection from either side,

 3       the Court will accept the factual portions of the

 4       presentence investigation report as undisputed and as my

 5       findings of fact at sentencing, as supplemented by my own

 6       review of the video exhibits in the case.

 7                All right.  We're now at the second step of the

 8       hearing where I will hear first from the government.

 9                So, Mr. Collyer, step forward to the podium.

10                MR. COLLYER:  Thank you, Your Honor.

11                THE COURT:  Let me just begin by just laying out

12       the divergent recommendations I have received in connection

13       with sentencing in this case.

14                The government is recommending 14 days'

15       imprisonment, and a period of 36 months' probation, and 60

16       hours of community service; compared to the probation

17       office's recommendation of 24 months' probation, with 60

18       days of home detention; and the defendant's recommendation

19       of 12 months' probation, with an unspecified amount of

20       community service.  So there is quite a divergence here, so

21       I will hear all of the parties' arguments about why their

22       recommendation is the better one for me to consider.

23                So please proceed, Mr. Collyer.

24                MR. COLLYER:  Thank you, Your Honor.

25                Your Honor, the events of January 6, 2021, left a

 1    stain on the history of this nation.  Each individual

 2    participant contributed to the international embarrassment

 3    that is the Capitol riot.  I am sure the Court knows

 4    generally what happened that day so I will not belabor it.

 5           The government's sentencing recommendation today

 6    is based upon individual actions Mr. Watrous took that day.

 7           THE COURT:  Can I interrupt you for just one

 8    second because -- although the government at one point

 9    recommends 14 days' incarceration, 36 months' probation, and

10    60 hours of community service, on the same page of its

11    sentencing memo, it lists factors.  And it proceeds to say,

12    "These factors make a period of home detention and probation

13    appropriate in this case," without mentioning the 14 days'

14    incarceration.  So I just want to make sure I'm

15    understanding the government's recommendation correctly.

16           MR. COLLYER:  It is a recommendation of

17    incarceration.  That would be a typographical error; that's

18    my fault.

19           THE COURT:  Okay.  It's a pretty important part of

20    the memo, so I just wanted to make sure I got it.

21           MR. COLLYER:  I apologize.

22           THE COURT:  And you are also recommending 14 days'

23    incarceration, while arguing that the split sentence is

24    appropriate here; so a total of 14 days, and then followed

25    by 36 months of probation.

1          MR. COLLYER:  That's correct, Your Honor.

2          I know that Your Honor has had extensive briefing

3     on that, and is well versed --

4          THE COURT:  Right.  And I have, to date, not

5     resolved the split sentence issue for petty offenses,

6     although others of my colleagues have.  And there is a

7     divergence of opinions among my very thoughtful colleagues

8     about whether it's appropriate or not.  And it's -- I don't

9     think I have to resolve that issue in this case, do I?

10         There may come a case where I have to make a

11    decision is a split sentence appropriate for a petty

12    offense; but in this case, where the government's

13    recommendation -- even if I decided to follow the

14    government's recommendation -- I don't see any reason, with

15    the authority I have, to impose probation with special

16    conditions of intermittent confinement without having to

17    touch the split sentence legal debate.

18         Wouldn't you agree that I don't have to resolve

19    that issue here?

20         MR. COLLYER:  I do agree, Your Honor.

21         I think given the range of sentences available to

22    the Court in this case, or in any petty offense case, it's

23    not necessary for the Court to resolve the issue.

24         Specific to this case and our recommendation, the

25    Court, I am sure, is referring to imposing incarceration as

1   a special condition of probation.  And given the term which

2   we're recommending, I would also agree that, for that reason

3   as well, the Court would not be required to make a

4   determination on the split sentence, but could also impose

5   the sentence recommended by the government.

6           THE COURT:  All right.  Okay.  So the government

7   is doing, I think, a good job in its briefing identifying

8   factors that it believes warrants -- supports whatever

9   recommendation it's making in specific cases.  And it's

10  really helpful in identifying for the sentencing judges, I

11  think, for opposing counsel what to focus on in terms of the

12  appropriate view of those factors.

13          And in this case, the government has identified

14  eight aspects of the defendant's conduct that it has said

15  warrants the recommended sentence.

16          One, that the defendant knew, when he came to

17  D.C., that certification -- the certification vote by

18  Congress was scheduled; two, he approached the Capitol

19  despite hearing flash-bang grenades and detecting tear gas

20  upon his arrival; three, he took a photo of a damaged window

21  just before entering through the adjacent door; four, he

22  stayed inside for five minutes despite immediately

23  recognizing, upon his entry, that the situation was, in his

24  words, "Fucked up"; five, he watched a man go inside and

25  steal wine reportedly from Speaker Pelosi's office; six, the

1    defendant re-entered a second time, after watching a rioter

2    steal the wine, and despite his apparent misgivings; seven,

3    the defendant minimized his conduct when interviewed by the

4    FBI; and, eight, the defendant, on October 1, 2020 -- and

5    that date is important because it was prior to

6    January 6th -- contacted the Proud Boys to obtain further

7    information on the group.

8            So I just want to focus in on some of those

9    factors.  Your seventh factor, that he minimized his conduct

10   when interviewed by the FBI, could you elaborate on what

11   prompts that characterization of the defendant's interview?

12           MR. COLLYER:  Yes, Your Honor.

13           During his interview, the defendant told the FBI

14   that he didn't go anywhere he wasn't supposed to be on

15   January 6th.  Now, he made those statements to the FBI after

16   having visited the Capitol in December 2020, and noting that

17   he couldn't get close because of police and barriers.  And

18   after -- on January 6th, observing the barricades, the tear

19   gas, the SWAT team, the damage to the window, the

20   flash-bangs, the aggression against the police officer at

21   the door, the confrontation inside the Capitol between

22   police and rioters; his realization that, in his words, the

23   situation was "Fucked up," after he realized that he was

24   surrounded by, in his words, "Troublemakers who were not

25   peaceful," and after watching someone steal wine purportedly

1    from Speaker Pelosi's office -- after all of that, he tells

2    the FBI he didn't go anywhere he wasn't supposed to be.

3              He also told the FBI how, quote --

4              THE COURT:  So, in some ways, the FBI's view is

5    that he still didn't view going inside the Capitol at all --

6    putting aside going inside the Capitol Building, going

7    inside the restricted area, past the barricades -- he didn't

8    view that as unlawful?  Is that how the FBI interpreted that

9    statement?

10             MR. COLLYER:  Yes.  And I think it's a fair

11   characterization that he felt essentially entitled to the

12   Capitol Building and anywhere on its grounds or interior,

13   and felt that he had a right to go where he went.  He also

14   told the FBI -- and I will, quote, "I was pissed they were

15   allowing it to happen," apparently proposing that the riot

16   on January 6th -- where a few hundred Capitol Police

17   officers were overwhelmed by thousands of rioters -- was

18   somehow the fault of the Capitol Police officers; that they

19   were allowing January 6th to happen.  That assertion is an

20   affront to the hundreds of officers who were injured that

21   day, and the officers who died that day and in the aftermath

22   of January 6th.

23             He said he eventually came to a realization that

24   he wasn't sure I [sic] was supposed to be there.  As if the

25   barricades and the flash-bangs and the SWAT team and the

1    tear gas were otherwise the Capitol's welcome mat.

2           So those, Your Honor, are statements he made

3    during his interview that show a minimization, a lack of

4    acceptance of responsibility and, really, a lack of

5    understanding of, I think, the damage done that day.

6           THE COURT:  And what was the statement that

7    started with "pissed" something?

8           MR. COLLYER:  "I was pissed they were allowing it

9    to happen."

10          THE COURT:  Referring to the Capitol Police and

11   MPD?

12          MR. COLLYER:  Referring to the Capitol Police

13   allowing the riot to take place.

14          THE COURT:  I see.  All right.

15          Okay.  So now I understand that characterization

16   better.

17          Okay.  Regarding the Factor Number 8, the

18   defendant's October 1, 2020, contact to the Proud Boys to

19   obtain further information -- as I understand that contact,

20   according to the government, the defendant emailed a local

21   Proud Boy chapter saying he was interested in possibly

22   joining; and the Proud Boys responded to that email but the

23   defendant did not follow up.

24          So the government doesn't have any evidence that

25   Mr. Watrous actually joined the Proud Boys; is that right?

1          MR. COLLYER:  That's correct.

2          THE COURT:  Or in any way contributed money, or

3     anything other than an email and having contact with the

4     Proud Boys; is that right?

5          MR. COLLYER:  That's correct.  He said that he did

6     not respond to the Proud Boys' response, and we have not

7     found evidence that he did respond.

8          THE COURT:  All right.  So this was in October

9     2020; this is before most of the Proud Boys, who have been

10    identified, have been indicted and are awaiting trial in

11    this court for their offense conduct on January 6th.

12         So what is a sentencing judge supposed to make of

13    the fact that before -- before the election had even

14    happened, actually, in October 2020 -- let alone before

15    January 6th -- that this defendant reached out to the Proud

16    Boys.

17         MR. COLLYER:  Your Honor, it is concerning that he

18    is an admirer of the Proud Boys.

19         He told the FBI that he was aware of them because

20    he had seen them at other rallies; he had heard politicians

21    speak of them.  And they intrigued him, and so that's the

22    reason he reached out.

23         I think, moving forward, it becomes an issue of

24    specific deterrence moving forward for the defendant.  If he

25    was intrigued by such an organization, there presents the

1    possibility or danger that he could become so intrigued.  Of

2    course, the rhetoric surrounding the stolen election has not

3    dissipated entirely.  Those organizations still exist --

4    indicted or not, they exist in some form.  So I think it

5    presents an issue of specific deterrence moving forward.

6                THE COURT:  All right.  So, essentially, the

7    government is raising that fairly brief contact with the

8    Proud Boys as reflecting or an indicia of his susceptibility

9    or attraction to extremist groups that would warrant a

10   lengthy period of supervision which the government has

11   requested?

12               MR. COLLYER:  Exactly, Your Honor.  Yes.

13               THE COURT:  I see.

14               And then, one of the factors that's not on your

15   list that I have articulated before -- I think most

16   sentencing judges look at this factor -- and that is how

17   promptly a defendant enters a plea, because that is a

18   reflection of acceptance of responsibility; and a prompt

19   acceptance of responsibility reflects an understanding of

20   the seriousness of the conduct.

21               And so, in this case, this defendant was arrested

22   on September 28th, 2021; charged by information about a

23   couple of weeks later, October 14th; and he entered a plea

24   agreement that was dated December 16th, 2021; and he entered

25   his guilty plea January 14th, 2022, a month after the date

 1    on the plea agreement.

 2             Does the government view this as a prompt plea?

 3             MR. COLLYER:  I would view it as a prompt plea,

 4    yes, Your Honor.

 5             THE COURT:  Right.

 6             MR. COLLYER:  Especially in context -- in cases

 7    that I am personally handling -- other cases -- certainly,

 8    this was a prompt plea.

 9             THE COURT:  All right.  So it's sort of the factor

10    that the government has said that, during the FBI interview,

11    the defendant didn't seem to understand or appreciate the

12    seriousness of the offense conduct or accept responsibility

13    for his actions.  But I have that -- as a counterweight, the

14    fact that there was, in my view -- also, I share your

15    view -- this was a fairly prompt plea of willingness to

16    stand up, take accountability for offense conduct as

17    charged, and proceed.

18             So how am I supposed to reconcile?  Does one

19    counterbalance the other?

20             MR. COLLYER:  They are certainly countervailing

21    points, and both should be considered by the Court in meting

22    a sentence.  I think, in terms of could there be a

23    progression in acceptance of responsibility and

24    understanding what January 6th meant from the date of his

25    interview last summer until today, certainly.

1          THE COURT:  What was the date of his interview?

2          MR. COLLYER:  I don't have the exact date.  I want

3     to say it was June 2021, or perhaps July.

4          THE COURT:  All right.  But it was in the summer

5     of 2021?

6          MR. COLLYER:  Yes.

7          THE COURT:  All right.  Now, in the defendant's

8     plea agreement, he is required to allow law enforcement

9     agents to review any social media accounts and to be willing

10    to sit for an interview.  Has this defendant complied with

11    this limited cooperation provision?

12         MR. COLLYER:  Yes, Your Honor.

13         So he gave the interview in the summer.  And,

14    during that interview, advised us that his "go-to" social

15    media platform was Facebook.  We did search Facebook;

16    nothing of significance there.

17         THE COURT:  Okay.  Let me just turn to the

18    restitution amounts.  Because I appreciate that the

19    government has provided -- as I requested at the time of the

20    plea -- updated figures as to the restitution costs here to

21    various government entities as a result of the January 6th,

22    2021, riot.  The total costs in the plea agreement was, as

23    of May 20, 2021, $1,495,326.55; and that's the figure that's

24    in probably hundreds of plea agreements at this point.

25         The government says that the numbers now have

1    slightly changed and spelled out a new total of

2    $1,574,213.89, which is an increase of $78,887.34.  And,

3    under that total -- this newly increased total -- there is a

4    new section that the government has provided labeled Capitol

5    Police, identifying an additional $1,160,569.25 of costs;

6    but there is no further comment about that.  And I take it

7    there is no further comment about that because of the plea

8    agreement in the case.

9              MR. COLLYER:  That's correct, Your Honor.

10             THE COURT:  So -- but that doesn't mean I can't

11   ask you questions.

12             MR. COLLYER:  Certainly.

13             THE COURT:  So the Capitol Police costs, if added

14   to the costs for the Architect of the Capitol, now amounts

15   to a total of $2,734,783.14, which is an 82 -- a little over

16   an 80 percent increase from the May 2021 estimate.

17             So given this substantial increase, is the

18   government -- going forward -- going to modify the $500 per

19   misdemeanor defendant standard restitution amount that it's

20   requesting?

21             MR. COLLYER:  That remains under review, but it is

22   a possibility that we will, in fact, adjust it.

23             The amounts the Court has seen in plea agreement s

24   so far was based on the original total, which was an

25   estimate of work to be done.  That's been updated.  Now that

1     work has actually been done, and we know actual parts and

2     labor costs; so that's the about $80,000 difference the

3     Court mentioned.  Capitol Police added as a victim which, as

4     the Court noted, substantially increased it.  But the

5     original -- in this plea agreement and other plea

6     agreements, the figures arrived at were based upon our

7     estimation of the number of people unlawfully in the Capitol

8     that day; and the amount of restitution at the time, about

9     $1.4 million; and that's how we arrived at that figure.

10          Certainly, in this case, we have come to an

11    agreement here, and that's why the government is not asking

12    for any additional restitution amount.  However, I think,

13    moving forward -- now that we have received updated figures,

14    those who have not promptly entered a plea at this point

15    could, in fact, be looking at a different restitution figure

16    as the government does its best to make everyone whole.

17          THE COURT:  All right.  So I found these figures

18    interesting.  One of the new details, in the government's

19    memo about the restitution amount, shows that the amount

20    linked to the Architect of the Capitol is $1,234,354.01,

21    which is actually less than the previous value of

22    $1,495,326.55; and that prior 1.5 general amount was deemed

23    the restitution amount owed to the Architect, whereas now

24    some of the restitution owed appears to be attributable to

25    other congressional bodies like the House Chief

1   Administrative Officer, the Secretary of the Senate, the

2   Senate Sergeant At Arms, and perhaps the Capitol Police.

3          Is it still appropriate to pay the $500

4   restitution amount entirely or disburse it entirely to the

5   Architect of the Capitol rather than to other entities who

6   have now been identified as being owed restitution?

7          MR. COLLYER:  Yes, Your Honor.

8          The Architect of the Capitol remains the largest,

9   in terms of monetary amount, victim; and the money collected

10  thus far, as we sit here today, has not satisfied that

11  amount.

12         THE COURT:  How much money has been collected to

13  date?

14         MR. COLLYER:  I don't know, Your Honor.

15         I mean, there's been, I think, approaching 200

16  pleas, some of which, if they're felonies, involve $2,000 in

17  restitution; but I don't have an exact figure.

18         THE COURT:  Has it even broken the $40,000 mark?

19         MR. COLLYER:  Probably not, no.

20         THE COURT:  Probably not.  Right.

21         Okay.  Well, I do appreciate the government

22  keeping up those restitution amounts.  And I think American

23  taxpayers will be happy to hear that the restitution amounts

24  being required, in plea agreements at least, are going to be

25  going up so that we can get it close to having people who

1    are responsible for the damages resulting in restitution

2    amounts are going to have to foot the bill, as opposed to

3    all the rest of us.

4         MR. COLLYER:  I would note also, Your Honor, in

5    specific cases where an individual is charged with specific

6    damage, that individual is being made to pay restitution for

7    that specific damage in addition to the amount of

8    restitution -- either the 500 or $2,000, depending on the

9    level of charge as well.

10        THE COURT:  Thank you for that clarification.  I

11   haven't had a case where I have seen that, so I appreciate

12   that.

13        Would you say, Mr. Collyer, that one of the --

14   among the most aggravating of the circumstances here was

15   that Mr. Watrous -- even after being in the Capitol the

16   first time for less than ten minutes, I think, and seeing

17   everything he did and leaving, that he actually decided to

18   go back inside?

19        MR. COLLYER:  Yes, Your Honor.

20        The second entry is a major aggravating factor.  I

21   would note that despite spending hours searching through

22   video, we were not able to find video of his second

23   entrance.  Now, our search was predicated on a number of

24   assumptions that all come from Mr. Watrous; namely, that he

25   went in a second time after the upper House door, and that

1    his other entrance was not before the upper House door, as

2    predicated on his assertion that he re-entered into the

3    Rotunda, which -- and he wasn't somewhere else in the

4    Capitol.

5           Now, one would think it would be difficult to

6    confuse the rotunda with another portion of the Capitol; but

7    we have seen significant confusion among defendants as to

8    where precisely they were in the building.  It's also

9    predicated on his telling us that he entered through more

10   centralized doors.  And, fourth, it's assumed that he was

11   dressed the same; he had not removed his hat or his coat.

12          Now, in terms of timing and geospatial analysis,

13   everything that Mr. Watrous tells us makes sense; that he

14   entered through the east Rotunda doors between 3 p.m. and

15   3:30 p.m., during which time those doors were breached and

16   entrance -- ingress and egress could be had.

17          Despite a search of that video for hours, both by

18   myself and the agent on this case, we haven't been able to

19   locate Mr. Watrous.  I found an individual who physically

20   resembles Mr. Watrous, but he is not wearing the hat, nor is

21   he wearing the blue coat with the tan elbow patches; so I

22   discounted it.  So unless Mr. Watrous took those items off,

23   we have been unable to find video of the second entrance.

24   But I don't believe there is any reason to disbelieve what

25   Mr. Watrous is saying.  He gave details that make

1    significant sense, in terms of other things that were going

2    on at that time on the east side; I just simply am not able

3    to find him on video.

4         THE COURT:  Well, according to what Mr. Watrous

5    said, he re-entered the second time because a woman he met

6    asked him whether it was okay to go in and, apparently, he

7    gave the green light and went in with her, no less.

8         So did he tell you or tell the government the name

9    of the person he brought into the Capitol the second time?

10        MR. COLLYER:  He did not.  He did not know her

11   name.  He had met her just before entering the Capitol.  She

12   reportedly hosts a YouTube channel.  I don't know whether he

13   specifically recognized her from YouTube or she told him

14   that she hosted a YouTube channel.  But there was a brief

15   conversation; she talked about wanting to go in, and

16   Mr. Watrous accompanied her in for the second entrance.

17        THE COURT:  And he didn't identify for the

18   government or the government didn't ask for him to identify

19   the YouTube channel?

20        MR. COLLYER:  We did.  I am not sure he knew it.

21   I believe it may have been something she just mentioned to

22   him.  He could more, I think, describe her as a blonde

23   female.  Not a lot we can go on.

24        THE COURT:  All right.  Is there anything further?

25        MR. COLLYER:  No, Your Honor.  Thank you very

 1    much.

 2              THE COURT:  Thank you.

 3              Mr. Orenberg.

 4              MR. ORENBERG:  Thank you, Your Honor.

 5              Good morning.

 6              Mr. Watrous is going to be --

 7              THE COURT:  Just one second.

 8              MR. ORENBERG:  Would you like your laptop?

 9              MR. COLLYER:  That's okay.

10              THE COURT:  He needs to put his mask back on.

11    Mr. Collyer needs to put his mask back on.

12              MR. ORENBERG:  I understand.

13              Good morning, again, Your Honor.

14              Mr. Watrous is going to be 60 years old in a few

15    weeks.

16              As I am sure Your Honor knows, from reading the

17    presentence report and my sentencing memo and Mr. Collyer's

18    sentencing memo, he has led a rather exemplary life until

19    what happened on January 6.

20              He had a problem when he was 17 years old; it was

21    a dalliance; it was a mistake as a youth.  But since that

22    time, he has, as I said, led a law-abiding -- productive,

23    family man.  He has raised four children.  He's been a

24    registered nurse for the last 40 years, since 1982.  He is

25    not practicing nursing right now; he's working as a delivery

1      driver.  He's been a respected member of his community.

2              Your Honor, I am sure you have heard this from

3      other similarly situated defendants and their counsel who

4      have come before you, but this was an aberration of

5      Mr. Watrous's life, what happened on January 6th.

6              Sure.  He admits that he had some contact or he

7      reached out to the Proud Boys a few months before; it was

8      before the election, there had been some publicity about the

9      Proud Boys.  In fact, the former President of the

10     United States had even mentioned the Proud Boys during one

11     of the presidential debates.  It's no secret who they were;

12     it was somewhat --

13             THE COURT:  And because the former President

14     mentioned the Proud Boys, I guess, in a positive way, this

15     defendant was curious about them?

16             MR. ORENBERG:  No, no.  I am not saying that.

17             I am just saying that there was some discussion --

18     or maybe I interpreted it wrong, between the Court and

19     Mr. Collyer, about my client's interaction with the Proud

20     Boys.

21             What I am driving at is my client is an educated

22     man, and he is curious about everything.  Okay?  He reads.

23     I have talked to him many hours about what he does; he is

24     very well educated.  And he had heard about this, so he

25     reached out to them; they replied.  And he decided:  This

1    isn't for me; I am not responding anymore.  Okay.  He had no

2    intentions of signing up with them or doing anything; he was

3    just curious.

4         THE COURT:  Well, he was asking about joining,

5    right?  Wasn't that the phrase used in his email, he was

6    interested in joining?

7         MR. ORENBERG:  Well, as I understand it -- and the

8    Court can ask him directly.  He just reached out to them

9    about their -- I guess what they were doing.  I don't

10   know -- as far as I know, he did not fill out an application

11   or anything of the sort.  Okay?

12        He was not charged with, you know, some sort of

13   subversive political views in this case.  He is charged --

14   he was charged with four misdemeanors involving trespass on

15   the United States Capitol grounds and building.  And he pled

16   guilty to demonstrating and picketing -- and demonstrating

17   [sic], as the Court well knows in this case.

18        What I am trying to point out to the Court -- and

19   I'm going back over the factors that the Court highlighted.

20   Let's talk about his --

21        THE COURT:  Well, one of the things you say in the

22   defendant's sentencing memo is that:  He followed the large

23   crowd to the Capitol.  And you say:  With no intention of

24   doing anything but having his voice join those of thousands

25   of other peaceful protesters.

1           And it's looking at some of the defendant's own

2     photos, like Exhibit 10, which shows the existence of

3     obvious barriers that were set up to stop people from coming

4     into and getting even close to the Capitol Building, and

5     this overwhelming mob, just ignoring the barricades, pushing

6     them out of the way.

7           Did this defendant think that this was a scene of

8     people having their voices heard, as opposed to what it was,

9     which was a mob overwhelming the police to get into the

10    Capitol?

11          MR. ORENBERG:  Well, Your Honor, I have talked

12    with Mr. Watrous about that, about what he was thinking,

13    what was going on at the time.  He tells that he thought --

14    and this ties in with the interview that he had with the FBI

15    and Mr. Collyer telling the Court that he -- that they

16    thought -- and perhaps he thinks, he does think -- that he

17    was trying to minimize his conduct.

18          Mr. Watrous believed that there should have been,

19    and he thought there was going to be, more security there

20    that day.  Okay.  When he said to the police that he didn't

21    go anywhere he wasn't supposed to go, that refers to his

22    time inside the Capitol Building.  Okay?

23          He didn't go into any hallway leading to the

24    Speaker's chambers.  He didn't go into the Senate chambers.

25    He didn't go -- he didn't try to enter any offices.  He --

1    initially, the first time, he was in the building for less

2    than five minutes.

3            Within a few minutes he realized -- I don't -- you

4    know, in the parlance of what has already been discussed, he

5    f'd up [sic], and he decided to leave the building as

6    quickly as possible.  He left by the east Rotunda doors.  He

7    did -- and this should be -- I think the Court should credit

8    this.  He was being candid with the police when he was

9    interviewed and told them that he had met a woman outside of

10   the east front -- outside the east Rotunda doors, and she

11   inquired about what was going on inside.  He accompanied her

12   back inside for a few minutes; he volunteered that

13   information.

14           It wasn't that that information was disclosed in

15   discovery production or Mr. Collyer calling me a few weeks

16   later and saying:  Oh, Mr. Orenberg, we found some

17   additional video of your client doing this, the second

18   entry.

19           THE COURT:  Yes.  But I have to say -- and I

20   appreciate you doing your job and saying that he voluntarily

21   disclosed he went in a second time.  But at that point, he

22   had been fully identified the first time he was in; so he

23   may very well have just thought it's inevitable, as more

24   time passes and the FBI is able to go through the gigabytes,

25   terabytes of video evidence -- that they might find me

1    again.  So, you know, he decided to disclose that rather

2    than being caught -- caught dissembling to the FBI, which

3    could have made his case far more serious, because lying to

4    the FBI in a formal interview then becomes a felony

5    violation of 18 U.S.C. Section 1001.

6          So he -- you know, yes, it was voluntary

7    disclosure; but the context here was he had already been

8    fully identified as going in at least once; and it would

9    certainly have put him in much deeper trouble had he

10   dissembled or lied to the FBI during that interview about

11   his activities on that date.

12         So what the government says this defendant said

13   about the first time he was inside is, he thought to

14   himself:  This is fucked up; this is crazy.  What is going

15   on here?  He had seen broken glass.  He had seen the

16   barricades breached.  He heard the alarms going off.  He saw

17   one-on-one confrontations with officers.  He saw people

18   stealing stuff from the Speaker of the House's office.  He

19   had seen chaos, and he left.  That would be an appropriate

20   reaction.

21         What is -- and I agree with the government here --

22   a very serious aggravating factor in this defendant's

23   conduct is that he went back inside a second time --

24         MR. ORENBERG:  First of all --

25         THE COURT:  -- with another person.

1          MR. ORENBERG:  It's a good point, Your Honor.

2          He thought at that time --

3          THE COURT:  It's a critical point, in terms of

4     evaluating this defendant's conduct.

5          MR. ORENBERG:  Well, at that point in time the

6     east Rotunda doors, as I understand it, were open.  They

7     were not being guarded or manned by any police officers; it

8     was more or less open.

9          And this woman, who he had met on the steps of the

10    Capitol, inquired about what was going on inside, and he

11    volunteered --

12         THE COURT:  And, I mean, I hear this -- I have

13    heard -- this is not the first defendant to say:  The police

14    weren't there telling me:  Don't go in.  It's like how many

15    of us sleep at night without a police guard outside of our

16    doors, you know, knowing -- because everybody knows it would

17    be unlawful to go into somebody's house that's not your own;

18    that is such a bizarre excuse.

19         It's sort of difficult to fathom how defendants

20    like Mr. Watrous who, as you say, is educated, law abiding,

21    could think -- having seen police being overwhelmed --

22    that -- because there wasn't a policeman standing at the

23    door with his guns drawn, and because the police didn't --

24    decided appropriately not to use lethal force, except on one

25    occasion, to keep some people out of the House Chamber where

1    people were sheltering under the desks -- decided not to use

2    general lethal force on these crowds, that it was somehow

3    okay to go in.  It's just an unfathomable excuse from where

4    I sit.

5              MR. ORENBERG:  Well, Your Honor, there are a lot

6    of things that were unfathomable about that day --

7              THE COURT:  Truly.

8              MR. ORENBERG:  -- but with respect to Mr. Watrous,

9    as I indicated, he made a terrible mistake in judgment that

10   day -- and twice; he is not running from that.  Okay.

11             He, as the Court pointed out properly -- and I

12   appreciate the Court doing so -- he quickly or promptly

13   resolved his case in this matter.  He did not drag it out.

14   He did not force the government -- he did not ask me to file

15   motions and get into pretrial lit- -- any of that.  He asked

16   me at the beginning, once we reviewed the evidence:  Let's

17   resolve this case, Mr. Orenberg; and we did.  And the Court

18   has recognized that he did resolve it promptly; he should be

19   credited for that.  Unfortunately, the facts, as the Court

20   pointed out, are not the best for Mr. Watrous.

21             But the point remains, Your Honor, he was in the

22   Capitol -- and I don't think Mr. Collyer will dispute

23   this -- for a total of less than ten minutes; less than five

24   minutes the first time, less than five minutes the second

25   time.  He did not go deep inside the Capitol.  He just went

1    in, recognized on the first visit that he made a mistake,

2    and got out.  And, for some reason, he went in a second time

3    with a woman who he had just met outside on the steps of the

4    Capitol --

5              THE COURT:  And to this day he doesn't know the

6    name of that woman?

7              MR. ORENBERG:  No, he doesn't.  He had -- he

8    relates, as Mr. Collyer pointed out, that she represented

9    she had some sort of YouTube channel and has been unable to

10   find it.

11             No, he does not know her name.

12             He took her in; they went out.  They separated.

13   He does not know who she is.  He does not know who she is.

14             THE COURT:  And what was the extent of the

15   communications he had with the woman outside?

16             The government represents that she asked:  Should

17   I go inside or should I not?  And then they ended up going

18   inside.

19             MR. ORENBERG:  Yeah, just a few brief sentences,

20   conversation.  It was sort of, you know, what was -- there

21   were a lot of people out there; they were talking with each

22   other.  It wasn't a long or extensive conversation that I

23   know of.  He didn't even -- as I said, he didn't get her

24   name, her phone number, the YouTube channel, address or her

25   email address, or anything like that.

1          It was just a brief encounter.  He mistakenly --

2     he has owned up to his mistake -- took her inside the

3     Capitol for the second less-than-five-minute trip inside the

4     Capitol.

5          Your Honor, I spent time --

6          THE COURT:  I take it that the defendant contacted

7     the Proud Boys after he heard some reference by the former

8     President to them.  Is that why he was interested in them?

9          MR. ORENBERG:  No.  I'm not saying that, no.  I am

10    not saying that.

11         I am just saying that the Proud Boys were known to

12    many people -- people who watched the presidential debates

13    or read *The Washington Post* -- whatever news source.  I

14    mean, they weren't some sort of secret covert operation;

15    they were becoming known to this country in the months

16    leading up to -- people of this country in the months

17    leading up to the general election in November of that year.

18    No.  I am saying that he watched --

19         THE COURT:  This defendant wanted to have his

20    voice heard because of his belief, based on what he heard

21    from politicians, including the former President, that the

22    election was stolen?

23         MR. ORENBERG:  To some extent.  Not to a great

24    extent.  He was concerned about what had happened in the

25    election.  He decided to come to Washington to --

1      THE COURT:  He was concerned about what he heard

2   about what had occurred in the election because he believed

3   that the election was stolen?

4      MR. ORENBERG:  Well, Your Honor, I have had

5   discussions with him about that.  I don't know that he

6   firmly believes that the election was stolen.  He just -- he

7   believes that there was something wrong with the process and

8   the way things were going.

9      THE COURT:  Well, that sounds like a word game,

10   Mr. Orenberg.

11      Does he still believe that?

12      MR. ORENBERG:  No, I don't -- no, Your Honor.

13      THE COURT:  Because there are politicians who are

14   still saying that.  But does he still believe that?

15      MR. ORENBERG:  No.  The Court can ask him that.

16      THE COURT:  I will.

17      MR. ORENBERG:  Okay.

18      THE COURT:  All right.

19      MR. ORENBERG:  If I may, may I --

20      THE COURT:  He's perfectly -- it's perfectly fine

21   for him to believe whatever he wants; it's his conduct that

22   those beliefs prompted which is the subject of what I have

23   to fashion an appropriate sentence about, so...

24      All right.  So one of the reasons that you suggest

25   that a probationary sentence is appropriate here is because

1   he has significant family obligations.  But from what I have

2   seen from the PSR, his children are adults; they're all in

3   good health.  He has a fairly minimal child support

4   obligation for a 20 year old that expires in about two

5   years; and he seems to have ample assets to cover that

6   fairly minimal child support obligation.

7          So what are his -- what are his significant family

8   obligations that you refer to on page 12 of your sentencing

9   memo?

10          MR. ORENBERG:  I was referring to the child

11   support and the fact that he's no longer working as a

12   registered nurse and he's working as a delivery driver

13   making 25-, $2700 a month.  As pointed out in the

14   presentence report, he has expenses which gobble up much of

15   that income that he has right now.

16          But he is a devoted family man; he tells me he is

17   in contact with all of his children.  He may not be in such

18   good contact with his former wives, but he is in good

19   contact with his children.

20          THE COURT:  All right.  Thank you, Mr. Orenberg.

21          Anything further?

22          MR. ORENBERG:  Yes, Your Honor.

23          I just wanted to briefly talk about the Court's

24   need not to impose a sentencing disparity among similarly

25   situated codefendants.  I had written about it in my

1    presentencing memo.  I pointed out to the Court a half a

2    dozen or so other cases with conduct very similar to

3    Mr. Watrous's, except for the fact that going into the

4    Capitol a second time, I agree with --

5              THE COURT:  And that is a critical factor.  And if

6    you have looked, every defendant who has appeared in front

7    of me -- and I think probably other sentencing judges -- who

8    have gone in twice -- twice into the Capitol, having seen

9    what they had seen, I have given -- been given periods of

10   incarceration.

11             MR. ORENBERG:  But I also pointed out cases where

12   clients have pled to the same count -- parading, picketing

13   and demonstrating -- where there was more egregious

14   conduct -- whether it was pushing on police barriers, going

15   through broken windows, taking children -- taking a child

16   into the Capitol Building, a minor child -- and the Court --

17             THE COURT:  I have a family of those.

18             MR. ORENBERG:  I'm sorry?

19             THE COURT:  I have a family of those.

20             MR. ORENBERG:  Okay.  In those cases, the Court

21   imposed a period of probation with home detention.  This is

22   the recommendation of the presentence report writer in this

23   case, as the Court pointed out -- 24 months' probation, with

24   60 days of location monitoring -- which would allow

25   Mr. Watrous to continue working during that period of time.

1      He would be home in the evenings.  He would not be allowed

2      to go out except under permission of the pretrial services

3      office --

4              THE COURT:  But none of his children live with

5      him, do they?

6              MR. ORENBERG:  No, Your Honor.  No, Your Honor.

7              So I am asking the Court to take into account the

8      other similarly-situated defendants -- sentences in this

9      case.

10             I did a quick count yesterday.  Mr. Collyer

11     provided the latest chart that I have of the sentencing

12     table, that we're calling it among our colleagues.  I just

13     did a quick count.  There's been 109 sentences imposed by

14     this court for the same offense:  Parading, picketing, and

15     demonstrating.  Out of those, 33 have been straight

16     probation, some with community service hours, and 39 have

17     been probation with home detention.  So that's about 72, or

18     about two-thirds, of the cases that have been sentenced so

19     far have been something less than incarceration.  And that's

20     what I'm asking the Court to do here, is to impose a period

21     of probation or a period of probation with home detention.

22             THE COURT:  And I appreciate that.  And if

23     defendant's conduct had been merely going in once, that

24     would have probably been what he would get, but you did not.

25     That is not his factual situation here.

1          MR. ORENBERG:  Okay.  Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Watrous, this is your

3     opportunity to speak directly to me.

4          MR. ORENBERG:  Would you like him to speak here or

5     at counsel table?  Because he's --

6          THE COURT:  I would like him to stand at the

7     counsel table and use the microphone.

8          THE DEFENDANT:  Good morning, Your Honor.

9          THE COURT:  Good morning, Mr. Watrous.

10         Do you have anything that you would like to say to

11    me?  Because I am willing to hear you since I haven't

12    received a letter from you or any letters on your behalf.  I

13    am interested to hear what you have to say.

14         THE DEFENDANT:  I would say that -- first, that I

15    certainly didn't come to Washington, D.C. that day to cause

16    any trouble.  I came to be amongst supporters for the former

17    President and had no intention of causing any harm, any

18    trouble.  I wasn't agitated.

19         I ended up, after the speech, heading to the

20    Capitol.  I came upon the Capitol grounds just at the time

21    that flash-bangs were heard and, you know, the smell of tear

22    gas.  And so immediately -- because the FBI asked me, you

23    know, said to me:  Well, that's your signal to leave.  What

24    I want to say in my defense is I did.  I left -- I left out

25    and up into the whole other side of the Capitol.

1          So whereas there was thousands and thousands and

2     thousands of people on the back lawn, and that's where all

3     of the activity was going up near the Capitol -- which I

4     couldn't see.  I just want you to know that I couldn't see

5     what was going on there, but I knew enough to leave.  And I

6     did leave, and went up and around.

7          Where, on the other side of the Capitol, it was

8     just much more calm; it was a totally different scene.

9          There was people all over the stairs -- the grand

10    staircases leading up to the Capitol; but there was no, you

11    know, massive crowds, all agitated outside the building.

12    So -- and I went through no barrier to get to that spot.  I

13    was able to walk around a pathway where other people were

14    walking to and arrive at the other side of the Capitol by

15    the House of Representatives.  So --

16          THE COURT:  So you think the police, on the other

17    side of the Capitol, just didn't want people -- the mob to

18    go in that way; they wanted them to go in on the other way,

19    on the opposite side of the Capitol?

20          THE DEFENDANT:  Well, that's what I didn't

21    understand, really, because I was like, I don't see any

22    police.  There was no police, and I could see people walking

23    up the stairs; walking in, some coming out; other ones going

24    back in.  And I was like, that's really odd; that's strange.

25          THE COURT:  Why were you so intent on getting

1  inside the Capitol?

2          THE DEFENDANT:  I wasn't really intent on going

3  inside the Capitol per se; I didn't plan on going in the

4  Capitol.

5          I walked up the stairs, and then I saw a broken

6  window right next to the door.  I understand.  I was

7  horrified.  You have to understand, I was horrified to see

8  that.  It really disturbed me that somebody had broken the

9  window to the Capitol; I was not happy.

10          I understand that I went by a man honor [sic]; I

11  understand.  I did.  Because, unfortunately, I was curious

12  to know what was going on in there, and so that's why I went

13  in.

14          THE COURT:  And you understood, when you went in,

15  that members of Congress, their staff were all there trying

16  to do their job and certifying the electoral vote?

17          THE DEFENDANT:  Yes.  And so I was, like -- I

18  heard -- I heard people yelling at the police, and I didn't

19  like it.  I observed them; and I was like, I am going to

20  leave, yeah, for sure -- leave that area.

21          And so I promptly went back outside.  And I was

22  standing there on the steps for a little bit, and that's

23  where this man, who was with his girlfriend or something.

24  He is like, "I am going to go in there."  "I am going to go

25  in there."  And then, like, five minutes later he comes out

1    and he's got a bottle of wine that he says he took from

2    Nancy Pelosi's office; and it said Democratic National

3    Convention on it.  He had been pepper-sprayed for his

4    activity, I guess; and I was just like:  What a dummy.  I

5    get it.

6            So I left from there again, to leave that area,

7    and started walking down to the central staircase.  And

8    that's where I ran into just a woman, you know, and her

9    friends; they were friendly.  It was calm there.  I started

10   talking to her --

11           THE COURT:  Would you say it was celebratory?

12   Everybody was excited and having a good time?

13           THE DEFENDANT:  No.  I wouldn't describe it as

14   "celebratory."  I just think everybody there was kind of

15   like:  What in the hell is going on?

16           Because I do want to express to you, Judge, that I

17   was not following on my phone like news reports, live action

18   of what was going on.  I had no idea about the horrific

19   violence on the other side of the Capitol -- if I am not

20   mistaken, on the Senate side.  So I had no idea that that

21   war zone -- I had no idea that that had taken place, Judge.

22   I had no idea that people had been violent and busted into

23   the Capitol, I truly didn't.

24           THE COURT:  But you saw the broken window.

25           THE DEFENDANT:  Yes.  Yeah.  That was what was so

1   perplexing.  I was like, Okay, where are those people --

2   those rioters who did that, and what's going on?  And I -- I

3   understand.  I understand.

4          So I just had a little encounter with this lady

5   and her friends.  I think -- honestly, I think she took my

6   phone number; and she said, Oh, maybe I will call you.  She

7   just told me a little bit about herself, supposedly; like --

8   she was, like, called Patriot Jen, or something like that.

9   She told me, Yeah, I have, like, a weekly -- I have, like, a

10  weekly YouTube show, et cetera, et cetera.  We just talked.

11  I said, like, maybe I will look it up some day, blah, blah,

12  blah; but she never called me.  And I did do like a search

13  to search for the channel, and I could never find the

14  channel.

15              THE COURT:  Are you done, Mr. Watrous?

16              THE DEFENDANT:  I would just like to say that in

17  any situation -- and that situation there at the Capitol

18  that day, I am 100 percent always going to be on the side of

19  the Capitol Police against the violent mob.  Okay?

20          Though I was in close proximity to members of that

21  mob -- and I understand that -- I would never be a part of

22  that mob against the police.

23              THE COURT:  You do understand that you were a

24  member of that mob.

25              THE DEFENDANT:  I understand that as events

1    unfolded, and looking back, that, yeah, I became a part of

2    that mob; and so I am not trying to avoid responsibility for

3    that, it's just situational, the way the day unfolded.  I

4    didn't -- I didn't know fully that I was in the middle of a

5    riot but, in fact, I was in the middle of a riot, and I

6    apologize.  And I apologize to the government -- and you, to

7    give you added work.  So I understand.

8            THE COURT:  And how about to the members of

9    Congress and their staff?

10            THE DEFENDANT:  Absolutely.  Yeah.  I definitely

11   didn't want to interfere with that, for sure.

12            THE COURT:  All right.  Are you done, Mr. Watrous?

13            THE DEFENDANT:  Yes, I am, Your Honor.

14            THE COURT:  All right.  The two of you can just

15   stand right there.  I am going to explain the sentence I am

16   about to impose and then impose sentence, Mr. Watrous.

17            So after considering the sentencing memoranda that

18   have been submitted by both the government and defense

19   counsel on defendant's behalf, the presentence investigation

20   report, the sentencing recommendation from all of the

21   different parties and from the probation office, hearing

22   argument today, I must consider the factors that are set out

23   by Congress in 18 U.S.C. Section 3553(a) to ensure that I

24   impose a sentence that's sufficient but not greater than

25   necessary to comply with the purposes of sentencing.

1          And it's worth it, I think, at each sentencing to

2     review what are the purposes of sentencing because those

3     purposes include:  The need for the sentence imposed to

4     reflect the seriousness of the offense -- and this was a

5     very serious day, and the offense conduct was very serious;

6     both -- not only for you, but for the country -- the

7     peaceful transition of power.

8          The other purposes include:  To promote respect

9     for the law, and the interruption of a constitutionally

10    mandated process that was going on in Congress that was

11    interrupted by what happened on January 6th did show

12    complete disrespect for some of our fundamental law in our

13    country, our Constitution, and the constitutionally mandated

14    process.

15         The other purposes include:  To provide just

16    punishment for the offense, deter criminal conduct, protect

17    the public from future crimes by you, Mr. Watrous, and

18    promote rehabilitation.

19         Since the federal sentencing guidelines do not

20    apply to this Class A misdemeanor, I need not examine the

21    specific 3553(a) factors related to the guidelines and

22    policy statements; but I do have to consider the following

23    statutory factors:  The nature and circumstances of the

24    offense, the history and characteristics of the defendant,

25    the types of sentences available, the need to avoid

1    unwarranted sentence disparities among defendants with

2    similar records found guilty of similar conduct, and the

3    need to provide any restitution to any victims of the

4    offense.

5         And I will begin with the restitution amount here.

6    Given that the statute of conviction is not covered by the

7    two general restitution statutes codified at 18 U.S.C.

8    Section 3663 and 3663(a), the Court has no authority to

9    determine any restitution amount, and is limited by what the

10   government agrees to in its plea agreement.  And as

11   discussed earlier, the plea agreement provides for a

12   restitution payment of $500, which the Court will order

13   pursuant to 18 U.S.C. Section 3663(a)(3).

14        Regarding the nature and circumstances of the

15   offense, as I have already mentioned, the defendant has been

16   convicting of parading, demonstrating, or picketing in the

17   Capitol Building, which is a petty offense, a Class B

18   misdemeanor.  And as I have made clear -- and I do at each

19   one of these because it bears repeating, given some of the

20   political discourse that goes on around January 6th --

21   although the defendant pleaded guilty to the criminal

22   statute titled parading, demonstrating, or picketing in a

23   Capitol Building, what happened on January 6th, at the

24   Capitol riot, was not protected First Amendment

25   demonstrating, picketing, or protesting.  As Mr. Watrous

1    conceded, as he was standing before me, it was a riot that

2    day; it was a war zone at the Capitol that day.

3          The defendant's conduct helped facilitate a riot

4    that overwhelmed law enforcement and succeeded, at least for

5    some temporary period of time, in disrupting the proceedings

6    of Congress to certify the 2020 presidential election.  On

7    January 5th, Mr. Watrous traveled alone from New York State

8    to Washington, D.C., to attend the Stop the Steal rally.  He

9    didn't coordinate his attendance with anyone; nor is there

10   any indication he made social media posts or otherwise

11   broadly advertised or encouraged attendance of that.

12         He was fully aware of the secured nature of the

13   Capitol area because, in December 2020, he had visited

14   Washington, D.C., including Capitol Hill, and noted he could

15   not get close to the Capitol because of the police and the

16   barriers.

17         He was also fully aware of the context of the

18   January 6th rally held by the former President, and knew

19   certification of the 2020 presidential election was to take

20   place that day within the halls of Congress.  And on

21   January 6th, he went to the Trump rally and then joined the

22   mob and followed that mob into the Capitol.  And along the

23   way, it became obvious something was greatly amiss.

24         He heard flash-bangs going off; he could detect

25   tear gas in the air.  Even before going inside the Capitol,

1    he saw all of this.  And those warning signs became clearer

2    as he drew nearer to the Capitol Building.  His own photos

3    document police barriers with Proud members on both sides of

4    the barriers, a clear sign of trouble.  He saw an array of

5    law enforcement vehicles, a damaged window immediately

6    adjacent to the door where he ultimately entered the

7    building.

8         He could hear alarms and people in the vicinity

9    who were repeatedly exclaiming such things as calling the

10   police:  "Fucking murderer," "Traitor," "It's our house."

11   "You swore an oath" -- referring to the police officers, and

12   active discussion about the shooting of another mob member,

13   Ashli Babbitt.

14        Nevertheless, despite these obvious indicia that

15   the police were trying unsuccessfully to keep people out but

16   were being overwhelmed by this angry mob, he exploited the

17   opportunity and he entered through the upper House door at

18   about 2:48 p.m. and stayed inside for five minutes.

19        Exhibit 6 shows that some people in the mob made

20   the choice to stay outside of the building then.  But this

21   defendant made the intentional choice -- despite the chaos

22   and confrontation with the police -- to go inside.

23        When inside, he roamed around the hallways and he

24   saw, inside, aggressive confrontations between mob members

25   and law enforcement, which should have further shown that

1    this was not an appropriate place to be.  Look at Exhibits 8

2    and 9, the video evidence which makes this clear.  He was

3    fully aware he should not have been inside the Capitol.  And

4    he later told FBI agents that he was at the time thinking:

5    "This is fucked up" and "This is crazy."

6         He left the building, but his story does not end

7    there.  Outside, on the steps, he met a woman who asked him

8    if she should go into the Capitol, and the defendant decided

9    to actually go back inside with her.  He didn't tell her to

10   stay out; he didn't tell her to leave the area.  He didn't

11   tell her that the police had already lost control of the mob

12   inside, so stay out instead; he went back inside with her.

13   To repeat, this defendant is a person who went inside the

14   Capitol Building twice on January 6, 2021, and the second

15   time brought another person with him.

16        After leaving, the defendant does not appear to

17   have publicly posted material from his Capitol intrusion;

18   nor has he sought out accolades from others as to his

19   behavior, unlike other defendants who have appeared in front

20   of me.  The nature and circumstances of the offense, the

21   need for the sentence to reflect the seriousness of the

22   offense and promote respect for the law would generally

23   favor a custodial sentence.

24        And even though this defendant did not physically

25   engage in violence or property damage or theft, which makes

1   him somewhat less troublesome than other defendants that day

2   and whose offense conduct was more violent specifically

3   towards the police and destructive of property inside the

4   Capitol, as defendant actually saw, he did enter the Capitol

5   twice.  And it was clear prior to his first entry that this

6   was not a place he was lawfully entitled to be, and what he

7   saw inside should have erased any possible doubt; but,

8   instead, he went in again.  The second intrusion

9   distinguishes him from quite a few others who only entered

10  the Capitol once very briefly and then left the scene.

11          Regarding his history and characteristics --

12  starting with his criminal history -- his criminal history

13  is limited to a misdemeanor DUI back in 2001.  He is twice

14  divorced.  He has adult children with his first wife; and he

15  has a support obligation of $100 weekly for his youngest son

16  who is 20.  He has a history of some substance abuse.  And I

17  think that substance abuse has resulted in treatment

18  periods; and I think have probably contributed to his early

19  termination of his career as a registered nurse.

20          The need for the sentence imposed to deter

21  criminal behavior and protect the public from further crimes

22  of the defendant are critical considerations for every

23  sentencing judge.  The seriousness of the criminal conduct

24  witnessed on January 6th highlights the need for deterrence

25  in the form of a sufficient sentence to deter this defendant

1    and others from engaging in this kind of conduct in the

2    future.  This is a country that's always prided itself on

3    the peaceful transition of power, and that history was

4    altered on January 6, 2021.

5            For the numerous individuals, like this defendant,

6    who suggest they got carried away with the mob which

7    overwhelmed the police and say they never intended to do

8    anything but attend a peaceful rally, I must repeat that

9    this excuse falls flat and defies what any rational person

10   was able to observe what I have seen in video after video

11   after video:  Violent chaos starting outside the Capitol and

12   carried inside the Capitol.  Every person participating in

13   the mob facilitated and amplified this egregious and even

14   violent conduct of many others.

15           When determining what sentence to impose, the

16   importance of deterring future malcontents from disrupting

17   the peaceful transition of power after an election weighs

18   heavily in this Court's considerations.  There are

19   consequences with going along with the crowd when the crowd

20   is engaging in clear, obvious criminal activity that

21   disrupted the peaceful transition of power after an

22   election.  No matter what any politician or any other person

23   yells with a bullhorn, it's just unlawful conduct.

24           Specific deterrence of some concern in this case,

25   in light of defendant's following the mob to the Capitol;

1    his email contact with the Proud Boys chapter in October

2    2020 expressing interest in possibly joining -- I appreciate

3    that there is no evidence that this defendant followed

4    through or made additional efforts to join the Proud Boys,

5    but his interest in associating with groups that actively

6    engage with the events of January 6th is troublesome.

7    Elections happen again and again; and so, too, will the

8    possibility for dubious challenges to the results of

9    peaceful, fair elections, and the peaceful transition of

10   power.  Consideration of this factor favors imposition of a

11   sentence that will promote respect for the law and deter

12   this defendant from additional criminal activity.

13           Regarding the types of sentences that I am allowed

14   statutorily to impose here because the defendant was

15   convicted of a petty offense Class B misdemeanor, he is

16   subject to a maximum term of imprisonment of only 6 months

17   and up to 5 years' probation.

18           The government has argued, at length, that both a

19   term of probation and a term of imprisonment may be imposed

20   for a petty offense based on its statutory construction of

21   the statute at 18 U.S.C. Section 3561(a).

22           Defense counsel doesn't address the propriety of a

23   split sentence in his submission to the Court, but -- and I

24   appreciate, as I have said before, in my colloquy with the

25   government counsel, there are opposing views among my very

1    thoughtful colleagues about whether a split sentence, which

2    is absolutely barred -- indisputably barred for felonies and

3    Class A misdemeanors, is permissible for a petty offense.

4    But I don't have to make that -- decide that legal question

5    here because, as an alternative to a split sentence, the

6    government requests the Court impose incarceration for a

7    brief interval as a condition of probation, and notes that a

8    sentence of up to two weeks' imprisonment served in one

9    continuous term followed by a period of probation is

10   permissible, under 18 U.S.C. Section 3563(b)(10).

11          Regarding the need to avoid unwarranted sentence

12   disparities, the defendant requests only a 12-month

13   probationary period, plus community service; noting that

14   compared to many other misdemeanor cases filed in the court,

15   Mr. Watrous's conduct is at or near the bottom of the scale.

16   Even if this characterization were correct, that defendant's

17   conduct is near the bottom of the spectrum of offense

18   conduct seen among January 6th defendants, a probationary

19   sentence cannot be presumed.  And I do not agree with that

20   characterization here.

21          This defendant went into the Capitol Building

22   twice; the second time he brought another person with him.

23   That's a noteworthy and serious aggravating factor and

24   warrants some term of imprisonment as a punishment for the

25   blatant double violation of the law in this most serious of

A

1    contexts; and every other defendant before me who has

2    entered the Capitol twice has been sentenced to a term of

3    imprisonment.

4         Given the specific offense conduct of Mr. Watrous,

5    the Court finds that a lengthy period of probation, with

6    short periods of intermittent confinement as a special

7    condition of probation, would be appropriate to ensure he's

8    subject to supervision at least through the midterms and the

9    next presidential election, and does not engage in political

10   violence of the kind that occurred on January 6th.  This

11   sentence would be consistent with the many sentences meted

12   out in January 6th cases for defendants convicted of the

13   same petty offense with similar conduct and criminal

14   histories.

15        So based on my consideration of these and other

16   factors, I will now state the sentence to be imposed.

17        Pursuant to the Sentencing Reform Act of 1984 and

18   in consideration of the provisions of 18 U.S.C. Section

19   3553(a), it is the judgment of the Court that you, Richard

20   Bryan Watrous, are hereby sentenced to a term of 36 months,

21   which is 3 years, of probation on Count 4 of the

22   information, with a special condition of 14 days of

23   intermittent confinement, in two 7-day increments, and

24   60 days of home detention.

25        In addition, you are ordered to pay a special

1   assessment of $10 in accordance with 18 U.S.C. Section 3013,

2   a criminal fine in the amount of $2500, and restitution in

3   the amount of $500.

4          While on supervision, you shall abide by the

5   following mandatory conditions, as well as the standard

6   conditions of supervision, which are imposed to establish

7   the basic expectations for your conduct while on

8   supervision.

9          The mandatory conditions include:  One, you must

10  not commit another federal, state, or local crime.

11         Two, you must not unlawfully possess a controlled

12  substance -- and marijuana is a controlled substance under

13  federal law.  So no matter what the local law is in your

14  state, marijuana is a controlled substance and you may not

15  lawfully possess it.

16         You must refrain from any unlawful use of a

17  controlled substance, including marijuana.  You must submit

18  to one drug test within 15 days of placement on supervision

19  and at least two periodic drug tests thereafter as

20  determined by the Court --

21         MR. ORENBERG:  Your Honor, excuse me.  He's having

22  a medical emergency.

23         THE COURT:  All right.  We will take an

24  interruption for five minutes.

25         What do you mean --

1    THE DEFENDANT:  I have to urinate.

2    THE COURT:  Please go use the restroom.

3    (Whereupon, a recess was taken.)

4    MR. ORENBERG:  Thank you, Your Honor.  We're ready

5    to resume.

6    THE COURT:  Of course.

7    All right.  I am just going to continue listing

8    the mandatory conditions and standard conditions of

9    supervision.

10    Three, you must refrain from any unlawful use of a

11    controlled substance; you must submit to one drug test

12    within 15 days of placement on supervision and at least two

13    periodic drug tests thereafter, as determined by the

14    probation office; you must make restitution in accordance

15    with the plea agreement in the amount of $500.

16    You shall comply with the following special

17    conditions:  You are ordered to pay a criminal fine in the

18    amount of $2500.  The Court determined you do have the

19    ability to pay interest and, therefore, does not waive any

20    interest or penalties that may accrue on the balance.  You

21    shall serve 60 days in home detention, which period shall

22    begin at the earliest practical date after sentencing.  You

23    are required to be in your place of residence at all times,

24    except for approved absences for gainful employment;

25    religious services; medical, substance abuse, and mental

1    health treatment; court-ordered obligations; and any other

2    such times specifically authorized by the U.S. Probation

3    Office.  Location or monitoring technology shall be used to

4    monitor your compliance, and you shall pay all costs

5    associated with the use of this system.  You must submit to

6    substance abuse testing to determine if you have used a

7    probated substance; you must not attempt to obstruct or

8    tamper with the testing methods.

9            You must provide the probation officer access to

10   any requested financial information and authorize the

11   release of any financial information.  The probation office

12   may share financial information with the U.S. Attorney's

13   Office.

14           You are ordered to make restitution to the

15   Architect of the Capitol in the amount of $500.  Restitution

16   payments shall be made to the Clerk of the Court for the

17   U.S. District Court, District of Columbia, for disbursement

18   to the following victim:  Architect of the Capitol, Office

19   of the Chief Financial Officer, attention Kathy Sherrill,

20   CPA, Ford House Office Building, Room H2-205B, Washington,

21   D.C. 20515, in the amount of $500.

22           The financial obligations are immediately payable

23   to the Clerk of the Court for the U.S. District Court, 333

24   Constitution Avenue Northwest, Washington, D.C. 20001.

25   Within 30 days of any change of address, you shall notify

1    the Clerk of the Court of the change until such time as the

2    financial obligation is paid in full.

3           Having assessed the defendant's ability to pay,

4    payment of the total criminal monetary penalties and

5    restitution is due as follows:  Payment in equal monthly

6    installments of $150 over the period of probation to

7    commence 30 days after the date of this judgment.

8           The probation office shall release the presentence

9    investigation report to all appropriate agencies, which

10   includes the U.S. Probation Office in the approved district

11   of residence in order to execute the sentence of the Court.

12   Treatment agencies shall return the presentence

13   investigation report to the probation office upon the

14   defendant's completion or termination from treatment.

15          Pursuant to 18 U.S.C. Section 3742, you have the

16   right to appeal the sentence imposed by the Court if the

17   period of imprisonment is longer than the statutory maximum.

18   If you choose to appeal, you must file any appeal within 14

19   days after the Court enters judgment.

20          As defined in 18 -- 28 U.S.C. Section 2255, you

21   also have the right to challenge the conviction entered or

22   sentence imposed if new and currently unavailable

23   information becomes available to you, or on a claim that you

24   received ineffective assistance of counsel in entering a

25   plea of guilty to the offense of conviction or in connection

1    with sentencing.  If you are unable to afford the cost of an

2    appeal, you may request permission from the Court to file an

3    appeal without cost to you.

4            Are there any objections to the sentence imposed

5    not already noted on the record from the government?

6            MR. COLLYER:  No, Your Honor.  Thank you.

7            THE COURT:  And, Mr. Orenberg?

8            MR. ORENBERG:  No, Your Honor.

9            But there is a point of clarification about

10   something the Court said about his child support payments.

11   During the brief recess, Mr. Watrous indicated to me -- and

12   I apologize for not bringing this to the Court's attention

13   earlier -- that the Court in New York recently, about three

14   weeks ago, entered another order or a final order of child

15   support.  So now he's paying $466 every two weeks for child

16   support.  I think the Court had said he was paying $100 a

17   week; but it's $4- --

18           THE COURT:  I think that's what the presentence

19   investigation report said.

20           MR. ORENBERG:  Right.

21           THE COURT:  That does not alter my judgment.

22           MR. ORENBERG:  Right.  Okay.

23           I just wanted to point that out to the Court.

24   Thank you.

25           THE COURT:  Okay.  Are there any objections to the

1   sentence imposed not already noted on the record by the

2   defense?

3            MR. ORENBERG:  No, Your Honor.

4            THE COURT:  All right.  You may be seated.

5            Does the government have a motion to dismiss any

6   open counts in the information against this defendant?

7            MR. COLLYER:  Yes, Your Honor.

8            The government would move to dismiss Counts 1

9   through 3 of the information.

10           THE COURT:  And that motion is granted.

11           Is there anything else to address today from the

12   government?

13           MR. COLLYER:  No, Your Honor.  Thank you.

14           THE COURT:  And from the defense?

15           MR. ORENBERG:  No, but I'm assuming this is a

16   voluntary surrender to -- the intermittent confinement needs

17   to be arranged, the voluntary --

18           THE COURT:  Yes.  Yes.  He will be on home

19   detention as soon as practicable, and that will give the

20   Bureau of Prisons time to designate the facility for him to

21   serve his intermittent confinement.

22           MR. ORENBERG:  Correct.  Thank you, Your Honor.

23           THE COURT:  Thank you.

24           MS. LUSTIG:  Your Honor --

25           THE COURT:  Yes.

1        MS. LUSTIG:  -- it's Crystal Lustig from the

2   probation office.

3        Are you transferring jurisdiction to New York or

4   are you --

5        THE COURT:  Absolutely not.  I am retaining

6   jurisdiction.

7        Should this defendant violate his terms of

8   supervision at any time during his 36-month period of

9   supervision, he will reappear in front of me, not another

10  judge in another court.

11       MS. LUSTIG:  Thank you, Your Honor.

12       THE COURT:  All right.  If there is nothing

13  further, you are excused.  I have another case.

14       MR. ORENBERG:  Thank you, Your Honor.

15       (Whereupon, the proceeding concludes, 10:58 a.m.)

16                      *  *  *  *  *

17                      **CERTIFICATE**

18       I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
    certify that the foregoing constitutes a true and accurate
19  transcript of my stenographic notes, and is a full, true,
    and complete transcript of the proceedings to the best of my
20  ability.

21       This certificate shall be considered null and void
    if the transcript is disassembled and/or photocopied in any
22  manner by any party without authorization of the signatory
    below.
23
        Dated this 31st day of May, 2022.
24
        /s/ Elizabeth Saint-Loth, RPR, FCRR
25      Official Court Reporter